Good morning, Your Honors. Thomas Hudson on behalf of the appellant Ziv Lagstein. I hope to reserve four minutes for my rebuttal this morning, and I plan to focus on three main issues. First, the compensatory award, including both the breach of contract and emotional distress damages, the punitive award, and then the disclosure issue. And unless the Court would prefer that I do otherwise, I plan to proceed in that order. What was your last issue? The disclosure issue. Turning to the compensatory damages award, the panel in this case gave a thorough and well-reasoned explanation for its award. It applied the law to the facts, and there's no allegation whatsoever in this case that it was procured by corruption. There's no suggestion that the panel failed to afford the parties an opportunity to present their evidence. And the district court in this case said that even — it could even see confirming the compensatory award if it were not for the total size of the award, including the punitive damages award. But it did, nevertheless, vacate the compensatory award, and Lloyds has argued that it should have been vacated due to erroneous findings of fact and conclusions of law. Well, let's get down to the basics. In what instances can an arbitration award be vacated? They're pretty narrow. They're very narrow, Judge Fletcher, and that's right. They're set forth in the Federal Arbitration Act, and we quoted those provisions in our brief. And that's why I mentioned the procurement by corruption or fraud. What the Supreme Court said in the Hall Street case is the grounds are statutory, they're narrow, and courts are not free to go beyond those. And one of the particular grounds that is excluded under the Supreme Court precedent, and of course by this Court's precedent, are things like going back and revisiting the merits. And we would submit that in this case, I have no doubt that Mr. Taggart, when he stands up, is going to begin talking about the facts. But the question to him is, didn't the panel already hear the evidence on these issues? Didn't the panel hear testimony from Dr. Lagstein, from his treating physician, from an insurance bad faith expert, review the credibility of witnesses and make findings of fact and conclusions of law? And if the answer to that is yes, and we submit it is, there's nothing further for a reviewing court to do in terms of the merits. So the reason the district court gave in this case, we submit, is clearly out of bounds under the Federal Arbitration Act. And unless the Court has further questions on the compensatory award, I'll turn to the punitive damages award. On that issue, what you see in some cases is an agreement that precludes an arbitration panel from getting into the issue of punitive damages. And that might be an excess power type of case. Is there anything in this agreement that could possibly be read to preclude punitives? Absolutely not, Your Honor. And in fact, not only the agreement in no way sets any limitations on the remedies that the arbitration panel could award. Additionally, there's never been a suggestion in this case by Lloyds or the district court that the arbitration agreement itself precluded the panel from awarding punitive damages. Instead, the district court vacated it due to a procedural timing issue. The district court said in essence that the arbitration panel, although it once had authority to award punitive damages, lost that authority. That, however, does not withstand scrutiny under the Federal Arbitration Act for at least three reasons. First, we know from this Court's case in McKesson, for example, that an arbitration panel's decision about its authority and its procedural rulings are entitled to the same deference as any other ruling. Second, the panel in this case we submit absolutely had authority under the arbitration, commercial arbitration rules, and in particular, Rule 36. And I won't belabor that because we detail that in the brief, but we included a copy and attached a copy to our reply brief, because it specifically says that a panel has, an arbitration panel has the power to reopen a hearing if it chooses to do so. And that's, of course, what happened in this case. And third, we would submit sort of the big picture, it just makes no sense whatsoever to say that an insurance company like Lloyd's can simply go unpunished due to a procedural timing issue like this, particularly because it was, it's been conceded, it was conceded by Lloyd's below that the appropriate remedy, if the award was vacated, was to have another arbitration award. And we submit if the appropriate remedy is to have another arbitration award, but it was held too late. It's internally inconsistent. I would like you, before you run out of your time, to reach the conflict of interest issue, because presumably, even if everything else you say is true, if the conflict, undisclosed conflict, I'll call it for short, infected the arbitration, then everything you've said turns out not to matter. I agree. And I'm turning to that now, Judge Graber, and I'm glad you raise it. There's really, well, at least three points I want to emphasize in that regard. Big picture, we would submit that the law simply cannot be that a party can, after it loses an arbitration, go and claim that what it should have been disclosed to it, information that is general background concerning an arbitrator, has no to, has no connection whatsoever to any of the parties in the arbitration. And, three, is readily accessible, publicly available information. And we say that because if that were the rule, it would create a perverse incentive for any party losing an arbitration to go and essentially do background checks on the, do the due diligence that should have been done on the front end and try to And big picture just makes no sense. Second, in this case, like most cases, what the arbitrators disclosed was very clear. And we included these in our excerpts of record because, in some ways, looking at them says more than describing them. But when you look at them, and they're at, they begin at E.R. Page 237, what's clear is that the arbitrators were disclosing what you said, Judge Graber, conflict information, information concerning the parties and their attorneys. There was no suggestion in these disclosures that there was sort of additional information or a CV of their history that they, that the Justice had set on the Nevada Supreme Court or anything else. And what, what the law says, quite correctly, is that if you get a disclosure and you think something else should be addressed, ask for it on the Third, the law correctly, again, focuses on, and in terms of the arbitrator's disclosure obligations, correctly focuses on information related to the parties, partiality in connection with the parties. And this goes back to your, your point, Judge Fletcher, which is the Federal arbitration itself has very specific grounds and very specific language. And the disclosure body of case law has grown out of the language that talks about partiality. Well, when you talk about partiality, you're talking about partiality for or against a particular party. It's a norm that has an object that it points to. And that's, again, what this Court's case law has said. We cited the Schmitz case and the Woods case, and I suppose it's common sense that when you talk about bias, you have to be talking about bias for or against a party. Again, to suggest otherwise would, would open up arbitrations to, to be subject to all kinds of post-award challenges that would undermine their finality. And unless the Court has more questions on any of these issues, I'll save the balance of my time for my rebuttal. I don't believe we do. You should feel free to reserve. Thank you, Judge Grim. Thank you, Your Honor. Evan Tager for Kiln. I'd like to start with the disclosure point, because we think it's so very important in this case. And just to remind the Court, our position is that Arbitrator Whitehead had a disclosure point, and  obligation to disclose that he agreed to leave the bench in order to avoid prosecution by the United States. And that his failure to so disclose is an independent basis for affirming the vacature. Would you point to the section of 9 U.S. Code Section 10, which talks about vacating arbitration awards, and tell me which section applies to that situation? Sure. It derives from 1082, which ---- Where there was evident partiality or corruption in the arbitrators or either of them. That's correct. That's where you hang your hat. The Commonwealth Codings case, which is the source of the disclosure obligation and the rule that the failure to disclose should result in vacature, invoked 1082 and focused on the partiality language. And our point, obviously, is that they're both cited there. Therefore, there has to be mirror obligations, whether it be a reasonable impression of partiality or a reasonable impression of corruption. Insofar as ---- Well, which is it in your view? Is this partiality or corruption? Well, actually, it's both, Your Honor. How is it partiality? It's partiality because the accusations that gave rise to the investigation have to do with Judge Whitehead retaliating against the disfavored party and helping a favored party. Well, but what was he ---- but does that suggest that he favored or disfavored either of these parties in this case? Well, it suggests that we, as a reasonable party, making an informed decision about who we're going to ---- That's not my question. Does the fact that he engaged in that behavior a decade before with some other parties suggest that he had partiality in this instance? It doesn't suggest that he had partiality in this instance. What it suggests, though, remember, he did disclose a prior relationship with the lawyers for our opponent. Those lawyers had used him for mediations, and they had put him or proposed him for this panel. Basically, they have given him a lot of money by virtue of using him repeatedly for mediations and by putting him on what turned out to be an exceptionally expensive arbitration because of the way they handled it. So we would have had quite a valid reason for feeling that he might, if we knew then what we know now, we would have thought this guy ---- What you know now. One is, once there was a disclosure of something that might have given you a hint that there was a problem, you could have asked more questions your client could have. And the other is to do background research. This information was in existence and was publicly available at the time. Well, a couple of responses. First, the case law is pretty clear that we don't have that burden. The burden is on the arbitrator to disclose. And as Justice White said in his Commonwealth Codings Concurrence, and as this Court then quoted him, that language in the new Regency decision, the arbitrator should err on the side of disclosure. So there's no such thing as waiver in this context? So if something is easily knowable or even known and you say nothing at the time, you can come back later? Well, first of all, the Eleventh Circuit in the Middlesex Mutual case said no waiver at all. Now, have you gone that far? Maybe not yet. But what you have said, the one case where there was a waiver is that Fidelity case. That was a case in which they were not serving as neutrals, the opposing party put forward an arbitrator, and no court then found basically constructive notice. You should have known, because this guy was not going to be a neutral, that they had a prior relationship with him. And if you wanted to investigate further, that was your obligation. But outside of that limited context, there have been no cases saying that there's a waiver just because we couldn't dream up that this was an unusual event. You know, people don't get forced to leave the bench after being pursued by the United States government. But isn't it commonly the case that when there are arbitrators, particularly in a large case, that one investigates their background? Well, we're entitled to investigate them, but we're not obligated to. And the Court in, you know, in Commonwealth Coding and Schmitz and New Regency, in all of those cases, the Court said we want the arbitrators to do this so that the parties are fully informed. Counsel, I have difficulty, and I have everything disclosed. It doesn't tell me that these arbitrators would be against your clients, that they would not be impartial. There's nothing there that would say they would be partial to one side or the other. He may be a rascal. He might collect child porn. He might do a lot of things. But Well, this isn't about Tell me exactly, exactly what shows that he couldn't be impartial in this case. Well, first of all, what he was investigated for and what he agreed to leave the bench for and what the United States was pursuing him for was for retaliating against parties and engaging in ex parte communications, stuff that no party with knowledge would ever willingly allow an arbitrator to serve for. Remember, everybody here agrees the standards for vacating arbitration awards are narrower than the standards for overturning a jury verdict or a ruling by a district judge. So because of that, the disclosure obligation has to be much more, more encompassing. And the case law says that the parties should have the right to decide whether to let someone control their fate in that way. So we could have this was a case in which the arbitrators agreed there would be no ex parte communications. So here's a guy in his background who violated or was alleged to have violated the code of ethics by engaging in ex parte communications. Now, is there any indication that there was any ex parte communication in this case? Well, we don't have to establish, you know, the But this is a yes or no. There's no, but how can we know? How could we know if he did it or not? That's the point. We have to trust these people. How can you trust somebody who has been alleged to have engaged in ex parte communications? Here's a guy who was nominated for the panel by a lawyer he had a prior relationship with. It was going to be a very lucrative engagement. If we had known that That much you knew. Yes. Well, not as much as not as lucrative as it turned out to be after the But you knew about the prior relationship. And if that Yes, but that alone Well, that alone That alone is not partiality, right? It wasn't enough to cause us to ask to have him removed. What the AAA would have done if we had, I don't know. But when you combine the two, it seems to me there's more than enough reason at that point for us to, A, move to strike him and, B, for us to succeed in that. And, C, there's certainly no way we would have agreed to let him have such a dominant role in choosing the third arbitrator. So there is a whole lot of implications as a result of us not being told this. Now, you did ask about, well, couldn't wasn't it well known? Couldn't you have found out the stuff? This stuff happened like a decade before the arbitration. It's certain we have. Makes it seem a lot less relevant. I mean, to me, it seems like you have sort of two two pieces. Either it's so old that you couldn't reasonably have found it and therefore maybe not as important as his more recent behavior or, you know, it's recent and easy to find. Well, let's hypothesize that he had been convicted of bribery. Would it matter that it was 10 years ago? No. He wouldn't be on the AAA panel, probably. Well, if he entered into a nonprosecution agreement to avoid bribery, charges of bribery, whatever the case may be, this stuff is serious and it doesn't go away with time. We have a right to think that if he's engaged in ex parte communications and retaliatory behavior in the past, he would do it again. Now, in terms of but it is relevant because we have all of the relevant decision makers in this case, the two lawyers and the client all said they had no actual knowledge of it. So what you're really saying is goes back to your original question. Did we have some kind of affirmative obligation to ferret this out, to do all kinds of digging on the panel beforehand? And I think the answer to that is no, we didn't. And I think you would be deviating from your prior cases if you were to impose that obligation on us. And also going back to your original question, I think I addressed why it's a reasonable impression of partiality, but I think it's also a reasonable impression of corruption as well, because that conduct is corrupt conduct. I don't think you need to establish that there was an exchange of money for it still to constitute corruption in the sense used in the statute. You have to show the corruption or the possibility of it in this particular arbitration. No. I mean, I think in the Schmitt's case, the court distinguished between actual bias and an impression of partiality and said they're two different things and you don't have to show that it actually affected the arbitration. And the same would go for this sort of mirror image part of the standard that we're advancing to you today. With the court's permission, I think I'd like to move on to the punitive part and respond to some of the arguments there. The Dr. Latson's principal argument about why Judge Jones erred in vacating the punitive damages award is that the 30-day time limit in the commercial arbitration rules is merely precatory, but the rules use the word shall, which the Supreme Court's decision in Lexicon v. Milberg Weiss, 523 U.S. 2635, where the court said the panel's instruction, and here it's referring to the MDL panel, comes in terms of the mandatory shall, which normally creates an obligation impervious to judicial discretion. Well, we have to be careful about that. Sotomayor, if the second hearing is viewed as a reopening of the original hearing, there's no time problem, right? Well, it wasn't and it couldn't be. Well, that was first. If it were, would there be a time problem? If it was successfully reopened under Rule 36, but this fails Rule 36 for two reasons, Your Honor. The first is that the rule itself says that the hearing may not be reopened without the party's permission if doing so would prevent the making of the award within the specific time agreed on. And here the contract incorporates the AAA rules, which have the 30-day limit, and then the parties and the arbitrators all agreed on that 30-day time limit. Second, even when there is no time limit, Rule 36 says that the hearing may be reopened at any time before the award was made. Here, the second hearing was scheduled in the award, not before it. So Rule 36 is of no help here. I'd like to also respond to Mr. Hudson's statement about us agreeing that the vacature of the punitive award would result in a redo. That is not what we said. We said the vacature of the entire proceedings, either under our disclosure argument or under our manifest disregard argument, would result in a redo. If the only thing that this Court agrees with us on is the punitive damages, there would be no redo. It would just be the end of the case. And the final point I want to make on this point is that we suffered real prejudice here as a result of the way in which the panel did it. The after-the-fact decision to bifurcate the hearing caused us to incur material additional expense, more time, more burden. Remember, we have a client here who's in England who had to come all the way out to Las Vegas for the new hearing. We also, because of the way the panel did it, the first award was a freestanding award. Our clock was ticking to move to vacate that. As a result, we were in the completely untenable position of having to make these arguments about the integrity of the arbitrators while they were still holding our fate in their hands on the punitive damages award. So when we did that hearing, we had some very angry arbitrators to contend with. That's the prejudice from them violating their time limit in the way they did. Was there a final award before the award of punitives? The first award was a final award. They came back later and said it's only an interim award, but we could not rely they came back in their punitive award and said it was only an interim award. But by then, we had to have moved to vacate it. We couldn't take chances that someone would say we were out of time. It would be like your last case. So we had to move to vacate it within the 90-day period. Thank you, Your Honor. Thank you very much. I believe there is rebuttal time remaining. Thank you, Your Honors. I'll try to be brief. First, I just want to make a point about the context, and I think you had it exactly right, Judge Graber, which is the events that Lloyds came to complain about was 10 years old. In the interim, Justice Whitehead had conducted over 400 arbitrations involving bad faith cases. He conducted a number of arbitrations with Lloyds. Well, for your part, why does that help? If the conduct in which he engaged is properly viewed as corrupt, the fact that others might not have objected to him doesn't mean that the 401st person could not. Well, I think it has to be put in context of sort of what's going on in the arbitration proceeding. And at some point, stuff does become history. But I take your point, and let me move to my second one, which is even though it was, it dated back that long, it was because it had such publicity in Nevada, it was readily discoverable through anybody conducting basic due diligence on the arbitrators. And what this Court said in the Fidelity v. Dergamont case is that a party can't sort of lie in wait. There's, I guess I think it's just basic common sense that when you're talking about an arbitration, parties have to do basic due diligence and can't sort of lie in wait and wait for the outcome and then do what they should have done on the front end and complain about it. Again, it goes to the finality rule. And that's the, when we talk about the disclosure burden, I think in essence, when you look at the case law, what's being distinguished is case-specific, information specific to the particular case or parties. That's when an arbitrator has a disclosure obligation. To impose something more sort of becomes ethereal. It's unclear what has to be done. And the Schmitz case, which Mr. Tager mentioned, the Commonwealth Codings case, both involved, you know, one involved the arbitrators had done a bunch of business with one of the parties, had a bunch of cases involving representing the parties. Well, that's the kind of information when it's case-specific, party-specific, that has to be disclosed. But when you're talking about information that has no connection whatsoever to any of the parties or the case, it's the kind of, again, basic due diligence that has to be done on the front end. And that's, again, the Fidelity case stands for it and so on. And, you know, in this case, the context, I think it is worth noting that Justice Wyhatt, and this is on page 312 of the excerpts of records, had done arbitrations for both parties. So, you know, it's not as though he had a relationship with only one of the parties. Although, albeit a different syndicate, he'd done arbitrations for Lloyds. And unless there's further questions on the disclosure issue, I'll just make a very brief point on the punitive damages award. Again, the panel has the authority to decide procedural issues. That's what the panel did here. The same rules that apply to sort of second-guessing the merits apply to second-guessing procedural rulings. And we've adequately explained this in the reply brief. And so, unless the panel has further questions, I'll ask the Court to. Was the first award final? No, Judge Canby, it wasn't. And the reason we say that is because the panel decided to hold a hearing on punitive damages and reopened the hearing pursuant to Commercial Arbitration Rule 36. The panel also gave other reasons for its decision to hold a hearing on punitive damages. It, of course, was the procedure required by Nevada law. And if you look at the first award, it explicitly says that there's going to be a punitive damages hearing. By its terms, it doesn't say that it's a final award. We would ask that the Court grant the relief requested in our briefs. Thank you, counsel. We appreciate the arguments of both parties. They've been interesting and well-prepared. And the case just argued is submitted.
judges: Fletcher B. , Canby, Graber